# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| FLEMING BUILDING COMPANY, INC., an Oklahoma corporation, <br><br> Plaintiff, <br><br> vs. <br><br> M2 ENGINEERING AB, a Swedish privately held company, SVENSKA HANDELSBANKEN AB, a Swedish banking corporation, and EXPORTKREDITNAMNDEN, the Swedish Exports Guarantee Board, <br><br> Defendants. | Case No.09-CV-790-GKF-PJC |

## OPINION AND ORDER

This matter is before the court on defendant M2 Engineering AB's Motion to Dismiss. [Doc. No. 37].[1]  Defendant contends this case should be dismissed on the following grounds: (1) Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction; (2) Rule 12(b)(3) for improper venue; (3) *forum nonconveniens*; (4) Rule 12(b)(6) for failure to state a claim; and (5) Rule 9(b) for failure to plead fraud with particularity.  For the reasons set forth in this opinion, defendant's motion is granted.

### I. Facts

M2 Engineering AB ("M2"), a Swedish company, entered into discussions with an existing customer located in Salt Lake City, Utah, Synchronicity Mastering Services, LLC

---

[1]Svenska Handelsbanken AB and Exportkreditnamnden were dismissed pursuant to plaintiff's unopposed motions on May 14, 2010. [Doc. Nos. 40, 41, 43, 44].

("SMS"), for the commission and installation of a SQM Mastering System ("SQM System"). [Doc. No. 37, Ex. A, Affidavit of Andreas Andersson, ¶13]. After some discussion, it became apparent that SMS would not be capable of financing the transaction. SMS suggested that its affiliate, Fleming Building Company ("Fleming"), an Oklahoma corporation with its principal place of business in Tulsa County, could obtain financing and purchase the SQM System on its behalf. [*Id.*, ¶14]. M2 agreed to the arrangement, and subsequently entered into negotiations with Fleming. The contractual terms were negotiated by Martin Brown, the Vice President of Sales and Marketing of M2 Asia Pacific Co., Ltd, a subsidiary of M2. [*Id.*, ¶13]. Bill Laurson ("Laurson"), President of another M2 subsidiary, M2 America, assisted Brown in negotiations at the local United States level. [*Id.*, ¶12]. During the course of the negotiations, M2 representatives participated in conference calls with Fleming's employees and agents and sent e-mails to Fleming, including an e-mail containing the final version of the contract. [Doc. No. 48, Ex. 2, Aff. of Raymond A. Miller, Jr., ¶3; Ex. 3, Aff. of Arvil Eugene McCulloy, Jr., ¶3; Ex. 6, Aff. of Thomas Whitworth, ¶¶5-6; Ex. 7, Aff. of Williams C. Brigham, ¶¶5-6]. Additionally, M2 communicated with DCA, Inc. ("DCA"), located in Cushing, Oklahoma, to negotiate a contract for DCA to supply M2 with material products and software to meet its obligations under its contract with Fleming. [Doc. No. 48, Ex. 1, Aff. of Doug Carson and attached e-mails]. Laurson traveled to Fleming's office to ensure that the documents were properly signed; in addition, Laurson signed the documents before sending them to Andreas Andersson, M2's Deputy Managing Director. [Doc. No. 37, Ex. A, Andersson Aff., ¶15]. Fleming signed the contract on February 25, 2009. [Doc. No. 48, Ex. 2, Miller Aff., ¶4]. Andersson executed the contract on behalf of M2 on February 27, 2009, in M2's Spanga, Sweden, office. [Doc. No. 37, Ex. A,

Andersson Aff., ¶16].

Section 11 of the contract provided:

**GENERAL CONDITIONS OF SALE**

In addition to the terms and conditions set out in this agreement, the SELLER'S General Conditions of Sale, as set out in Appendix E, shall apply. Terms and conditions set out in this agreement and the associated appendices shall prevail over the general terms and conditions set out in Appendix E.

[Doc. No. 55, Aff. of Andreas Andersson and attached Contract for M2 SQM Mastering System and Associated Equipment for DVD/Blu-Ray Mastering, Section 11, p. 11 of 73]. Appendix E, in turn, provided in pertinent part:

**15 Jurisdiction**

Any disputes arising in connection with the purchase of the SQM System that cannot be solved [by settlement within a two-week period] shall exclusively be settled by the Laws of Sweden, excluding its conflict of law rules, and be brought before and settled by the ordinary courts of Sweden.

[*Id.*, Appendix E., Section 15, p. 58 of 73].

Fleming maintains that the contract it received for signature consisted of only five documents, and that "Appendix E, General Conditions of Sale" was not included. Fleming further contends that it was unaware of the provisions of Appendix E, and asserts that, had it known of the provisions in that document, it would not have executed the contract. Fleming also alleges that Appendix E was not included in the contract that was signed by M2 in Oklahoma on February 25, 2009. [Doc. No. 48, pp. 19-20].

Under the terms of the contract, M2 agreed to deliver, install, and commission a SQM Mastering System to be installed in SMS's Salt Lake City Facility. In exchange, Fleming agreed to issue Bills of Exchange, which were assigned to Svenska Handelsbanken AB ("SHB"), who,

in turn, issued a loan to M2 to facilitate performance of the contract. [Doc. No. 2, Complaint at ¶¶10, 12, 15, 17].

Fleming contends that M2 has failed to perform its obligations, that the funds from the SHB loan were used to satisfy other obligations, and that M2 is now insolvent. [*Id.*, ¶¶31-53, 58-62, 67-71]. Fleming further claims that M2 never intended to fulfill its obligations, that M2 knowingly misrepresented its capacity to satisfy the terms of the contract, and induced Fleming to sign the contract by its fraudulent and/or negligent misrepresentations and omissions. Fleming further claims that M2 fraudulently sold equipment to which it did not hold title to Fleming. [*Id.*, ¶¶41-42]. Fleming seeks damages for fraud, misrepresentation, fraudulent inducement, civil conspiracy, negligent misrepresentation, and constructive fraud.

## II. Analysis

As previously noted, M2 raises several arguments in favor of dismissal. This court need only address two of those arguments: First, the court must address the propriety of exerting jurisdiction over M2. Second, the court will assess whether this case should be dismissed for improper venue under Fed. R. Civ. P. 12(b)(3). Because the court concludes that venue is not proper, the remaining grounds for M2's motion need not be addressed.

### A. Specific Jurisdiction

As a preliminary matter, M2 claims that this case should be dismissed because M2 is not subject to jurisdiction in Oklahoma. If jurisdiction is contested, the plaintiff bears the burden of establishing jurisdiction. *AST Sports Science, Inc. v. CLF Dist. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). Where, as here, the question of personal jurisdiction is disputed in the preliminary stages of litigation, "the plaintiff need only make a prima facie showing of jurisdiction to defeat

the motion [to dismiss]." *Id.* The court will accept as true the allegations in plaintiff's complaint, and all factual disputes will be resolved in the plaintiff's favor. *Intercon Inc. v. Bell Atl. Internet Sol'ns*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). "In Oklahoma, this two-part inquiry collapses into a single due process analysis," because Oklahoma permits the exercise of personal jurisdiction to the full extent permitted by the United States Constitution. *Rambo v. American S. Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir.1998) (citing Okla. Stat. tit. 12, § 2004 F). Accordingly, the only question remaining is whether the exercise of personal jurisdiction over the nonresident defendant comports with due process. *See AST Sports Science*, 514 F.3d at 1057. The Due Process Clause prevents courts from exercising jurisdiction over a nonresident defendant unless "there exist 'minimum contacts' between the defendant and the forum state." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). The "minimum contacts" standard can be satisfied in either of two ways: First, the court may exert specific jurisdiction over a defendant who has "purposefully directed his activities at residents of the forum," provided "the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1986 (10th Cir. 1998) (internal citations and quotation marks omitted)  Alternatively, the court may maintain general personal jurisdiction over a defendant who has maintained continuous and systematic general

5

business contacts with the forum state. *Id.* (quoting *OMI Holdings*, 149 F.3d 1986) (internal citations and quotation marks omitted).

Although this is a close case, the court concludes that M2 is subject to specific personal jurisdiction in Oklahoma.[2] The first requirement of personal jurisdiction–the purposeful direction of activities at residents of the forum state–has been satisfied by M2's negotiation and execution of the Fleming-M2 Contract. It is true that "[a] contract alone does not subject a nonresident defendant to the jurisdiction of the subject forum." *AST Sports Science,* 514 F.3d at 1059 (citing *Benton*, 375 F.3d at 1077). Nevertheless, factors related to the contract, including the terms of the contract, the future consequences of the contract, and the parties' negotiations and course of dealing, may support a finding of specific jurisdiction. *See Benton*, 375 F.3d at 1077 (citing *Burger King Corp.*, 471 U.S. at 479); *see also AST Sports Science*, 514 F.3d at 1059 (listing evidence of the parties' ongoing relationship, including "[p]hone calls, letters, facsimiles, and emails"). In this case, although M2 did not initiate the relationship with Fleming,[3] it did choose to pursue a continuing business relationship with that entity. For example, M2 participated in numerous phone calls with Fleming's Oklahoma office, sent e-mails to Fleming, and also sent e-mails to Doug Carson in Cushing, Oklahoma, regarding the related DCA contract.[4] Also, Bill

---

[2] In light of the pretrial status of this case, the discussion of facts that follows accepts Fleming's allegations as true and resolves factual disputes in Fleming's favor. *Intercon Inc. v. Bell Atl. Internet Sol'ns*, 205 F.3d 1244, 1247 (10th Cir. 2000).

[3] Instead, M2 engaged in negotiations with Fleming at the suggestion of SMS, a Utah company. *Cf. ATS Sports Science*, 514 F.3d at 1059 (finding the fact that the defendant initially approached the plaintiff about the business relationship to be "[e]specially significant").

[4] Although phone calls and letters "are not necessarily sufficient in themselves to establish minimum contacts," *Far West Capita, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995), such contacts do "provide additional evidence that [the foreign defendant] pursued a continuing business relationship with [the plaintiff]." *ATS Sports Science*, 514 F.3d at 1059

Laurson, a representative acting on M2's behalf,[5] traveled to Oklahoma to deliver the proposed contract to Fleming. *See Benton*, 375 F.3d at 1077 (noting that the defendant sent employees to Colorado to conduct due diligence). In addition, although the SQM System was to be delivered and installed in Salt Lake City, Utah, the exchange of information, the negotiation of contract terms, and the exchange of funds pertaining to the contract for that delivery took place between individuals and entities in Oklahoma and Sweden.[6] The parties further agreed that Fleming and M2–and not SMS–would attempt to settle any disputes that arose in connection with the purchase of the SQM System. [Doc. No. 55, p. 58 of 73]. Moreover, the parties contemplated a continuing relationship when they agreed that Fleming would make installment payments under the contract over a period of 36 months, and they expressly agreed that the bills of exchange related to those payments would be governed by Oklahoma law. [Doc. No. 55, pp. 10-11, 59 of 73]. In sum, M2 chose not to pursue alternative financing possibilities with SMS, and instead took advantage of an Oklahoma financing opportunity by negotiating with Oklahoma residents, entering into a long-term financial relationship with an Oklahoma company, and agreeing that at

---

(alterations in original) (quoting *Pro Axess v. Orlux Disrib., Inc.*, 428 F.3d 1270, 1278 (10th Cir. 2005)).

[5] M2 argues that Laurson was not an employee at M2 Engineering, but was instead President of M2's U.S. Subsidiary, M2 America Corporation. Nevertheless, it appears that Laurson was acting on M2's behalf during the negotiation and execution of the M2-Fleming contract: M2 admits that Laurson "assisted in the contract negotiations at the local United States level" and "traveled to Fleming's office [in Oklahoma] to assure that all documents were properly signed by Fleming." [Doc. No. 37, Ex. A, Andersson Aff., ¶¶ 12, 15]. Laurson also signed the contract before forwarding it to M2's Deputy Managing Director for execution. [*Id.,* ¶ 15].

[6] *See Benton*, 375 F.3d at 1077 (noting that, although the uranium transactions that were the subject of the contract would occur outside of Colorado, the "business end of the transactions," including the coordination of parties and the exchange of money and information would take place in both Colorado and Canada).

least certain provisions of the contract would be governed by Oklahoma law. Given these facts, the court concludes that the quality and nature of M2's contacts with the state were not "so . . . random, fortuitous, [and] attenuated" that M2 could not have anticipated being haled into court in Oklahoma. *Benton*, 357 F.3d at 1077-78 (alterations in original) (quoting *Burger King*, 471 U.S. at 486). Thus, the court finds that M2 had sufficient minimum contacts with Oklahoma to support the exercise of personal jurisdiction over M2.

The second requirement for specific jurisdiction is also met: Fleming contends that it was injured due to M2's failure to satisfy certain obligations under the contract, its misrepresentation of its capacity to satisfy the contract's terms, its failure to deliver the bargained-for product, Fleming's reliance on the fraudulent statements made by M2, M2's attempt to procure funds outside terms of the contract, and M2's attempts to conceal and misrepresent facts during and following the execution of the contract. It cannot be said that Fleming's cause of action does not "result[ ] from alleged injuries that arise out of or relate to [M2's forum-related] activities." *Benton v. Cameco Corp.*, 375 F.3d at 1075.

Having found that M2's contacts with Oklahoma (1) are sufficient to support the exercise of jurisdiction over M2 and (2) give rise to the cause of action at issue here, this court must now consider whether the exercise of jurisdiction over M2 would offend "traditional notions of fair play and substantial justice." *AST Sports Science*, 514 F.3d at 1061 (quoting *Asahi Metal Indus. Co. Ltd. v. Superior Court of California*, 480 U.S. 102, 107 (1987)). In other words, the exercise of jurisdiction must be reasonable in light of the facts and circumstances surrounding the case. *See Pro Axess v. Orlux Disrib., Inc.*, 428 F.3d 1270, 1279-80 (10th Cir. 2005). The *Pro Axess* court identified the following factors that should be considered in determining the

reasonableness of the exercise of jurisdiction:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Pro Axess*, 428 F.3d at 1279-80. Although M2 is a foreign corporation whose main offices are a significant distance from Oklahoma, M2 is a global company with a global reach, and it has engaged in business in the United States. [Doc. No. 55, pp. 4, 6 of 73 (agreeing, inter alia, to install the SQM System in the SMS facility in Utah, to assist Fleming in the de-commissioning of a SQM System in Vancouver, Canada, and to assist in the preparation of the Salt Lake City, Utah facility)]. It would not be "gravely difficult" for M2 to litigate this dispute in Oklahoma. *AST Sports Science*, 514 F.3d at 1062 (citing *Burger King*, 471 U.S. at 478). Furthermore, Oklahoma has an interest in providing its resident, Fleming, with a forum for its suit against M2, *Id.*, and Fleming would be burdened by traveling to Sweden and conducting litigation in an unfamiliar language, *Pro Axess*, 428 F.3d at 1281.[7] Given the facts of this case, it does not appear that M2 has "established a 'compelling case' that the exercise of jurisdiction . . . would be unreasonable." *ATS Sports Science*, 514 F.3d at 1063.

    In sum, this court finds that M2 has purposefully directed its activities at residents of

---

[7] The remaining two factors appear to be neutral: It is not readily apparent that the fourth factor, which asks "whether the forum state is the most efficient place to litigate the dispute," *AST Sports Science*, 514 F.3d at 1062, weighs in favor of either forum, as witnesses and documents are located in both Sweden and Oklahoma. Furthermore, it does not appear that the exercise of jurisdiction over M2 would interfere with Sweden's policy interests, particularly in light of M2's choice to conduct business in the United States. *Id.* at 1063 (finding that the fifth factor did not weigh against jurisdiction where the defendant chose to conduct business with the Colorado resident and "the alleged fraud arose out of that business relationship").

Oklahoma, and that this litigation arose out of those activities; the court further finds that the exercise of jurisdiction over M2 would not offend traditional notions of fair play and substantial justice. Accordingly, the court concludes that M2 is subject to personal jurisdiction in Oklahoma.

### B. Whether Oklahoma is the Appropriate Venue for this Action

M2 next asserts that, even if it is subject to jurisdiction in Oklahoma, this case should be removed to Sweden based on the venue-selection clause contained in Appendix E of the M2-Fleming contract; Fleming, however, maintains that the forum-selection provision is inapplicable, because it was not attached to the contract at the time the contract was executed.

To determine the validity of the forum-selection provision, this court first must determine which forum's law will govern the interpretation of the contract. *Yavuz v. 6 MM, Ltd.,* 465 F.3d 418, 427 (10th Cir. 2006) ("*Yavuz I*"). According to the terms of Appendix E, "[a]ny disputes arising in connection with the purchase [of the SQM System] . . . that cannot be solved [by settlement within a two-week period] shall exclusively be settled by the Laws of Sweden, excluding its conflict of law rules . . . ." [Doc. No.. 55, p. 58 of 73]. But the applicability of this provision has, like the venue-selection provision, been called into question by Fleming; Fleming claims that Appendix E was not the subject of negotiations and was not made a part of the Fleming-M2 contract.[8] Therefore, it argues, Oklahoma law–the only law discussed in the main

---

[8] *See* Doc. No. 48 at 14 and Ex. 2, Miller Aff., ¶¶ 9-11 (asserting that no documents other than the contract form, Appendix F, the confirmation from buyer's bank, the bills of exchange, and the notice of assignment, were presented when Fleming executed the contract); Ex. 3, McCulley Aff., ¶¶ 9-11 (same); Ex. 6, Whitworth Aff., ¶¶ 6-10 (same); Ex. 7, Brigham Aff., ¶¶ 6-9 (same).

Significantly, Fleming claims only that the Appendix was not attached to the final

body of the contract[9]–must apply.

Contrary to Fleming's assertions, this court concludes that, as a matter of law, the provision indicating that the laws of Sweden would govern all disputes arising out of the underlying purchase was properly incorporated into the contract and is therefore enforceable. The main body of the M2-Fleming Contract provided that "[in addition to the terms and conditions set out in this agreement, the SELLER'S General Conditions of Sale, as set out in Appendix E, shall apply." [Doc. No. 55, p. 11 of 73].[10]

The terms set forth in Appendix E were specifically referenced in the contract, and the terms of that appendix–including the clause selecting Swedish law–were incorporated into and became a part of that contract. *See City of Muskogee v. Martin*, 796 P.2d 337, 341-42 (Okla. 1990) ("Article V of the agreement incorporates all rules of the Muskogee Police Department into the agreement. It is hence clear that by specific reference in the collective bargaining agreement, the merit rules were incorporated into the agreement and became part of the agreement."); *Monkey Island Dev. Auth. v. Staten*, 76 P.3d 84, (Okla. Ct. App. 2003) ("[T]he Contract must include the text contained in the 'Common Provisions' because those provisions

---

contract presented; it does not claim that it never received the Appendix during the course of negotiations. [Doc. No. 54, Ex. F at 4 (zip file listing attachments to an email sent to William Brigham and Tom Whitworth)]. Moreover, it does not claim that M2 misrepresented the terms set forth in the Appendix during the course of negotiations or in the proceedings before this court.

[9] The contract provided that Oklahoma law would govern the bills of exchange. [Doc. No. 55, p. 11 of 73]. The bills of exchange are not at issue in this case.

[10] In addition, the Contract repeatedly referred to the "General Terms of Sale" set forth in Appendix E. *See* M2-Fleming Contract, Doc. No. 55, Section 7.1, p. 8 of 73 (requiring M2 to perform testing "in accordance with Paragraph 6 of the General Conditions of Sale, Appendix E"); *Id.* at Section 8, p. 9 of 73 (referring to appendix E); *Id.* at p. 12 of 73 (listing Appendix E among the enclosures).

are incorporated by reference into the three underlying agreements.") Absent a claim that M2 fraudulently induced Fleming to rely on misrepresentations regarding the subject matter of the contract, *see Miller v. Troy Laundry Machinery Co.*, 62 P.2d 975, 979 (Okla. 1936),[11] Fleming cannot escape the expressly incorporated terms of the contract on the grounds that it failed to read the provision incorporating Appendix E or inquire as to the terms of that Appendix. *See Bossert Corp. v. Holliday*, 260 P.480, 481 (Okla. 1927) (rejecting the plaintiff's claim that an attachment to the contract should not have been introduced, concluding that, although the catalogue was not physically attached, it was referred to in the written contract and "was a part of the original contract"); *Ozark States Trust Co. v. Winkler*, 292 P. 12, 17 (Okla. 1921);[12] *see also Williams Int'l Co. v. New W. Machine Tool Corp*, Case No. 09-12516, 2010 WL 331714, at *7-*8 (E.D. Mich. Jan. 22, 2010) (rejecting defendant's claim that the CT100 Terms and Conditions were not attached to the purchase order and were therefore not incorporated, as those provisions were expressly and unambiguously incorporated). The choice-of-law provision is expressly incorporated by the unambiguous terms of the contract, and Fleming cannot avoid the application of the provision by claiming ignorance of the terms of Appendix E . Accordingly,

---

[11] The *Miller* court noted that, "if fraud is actually shown, the negligence of the defrauded party in failing to read the contract . . . becomes immaterial." *Miller v. Troy Laundry Machinery Co.*, 62 P.2d 975, 979 (Okla. 1936).

[12] "We take it the rule is well established that in the absence of any evidence of incapacity to read, or any trick or artifice resorted to to prevent his reading it, a party signing a written instrument that is plain and unequivocal in its terms is bound by its express terms and conditions therein contained, and that he cannot set up his own carelessness and his own indolence as a defense, and, because he failed to make use of the faculties possessed by him for determining its conditions, be heard to say that its terms or conditions should be other or different than what they are." *Ozark States Trust Co. v. Winkler*, 292 P. 12, 17 (Okla. 1921) (quotation marks and citation omitted).

this court holds that the choice-of-law provision is valid, and Swedish law applies in this case.[13]

Having determined that the contract is governed by Swedish law, the final question for the court is whether the courts of Sweden would enforce the venue selection provision. M2's brief in support of its motion to dismiss expressly states that "Swedish courts strictly enforce parties' forum selection clauses." [Doc. No. 37 at 16]. Fleming does not reply to this argument, but, instead, relies solely on its argument that Appendix E–and the forum-selection clause–do not apply. Even had Fleming challenged M2's position, Swedish law provides for the enforcement of venue-selection provisions. *See* Code of Judicial Procedure 10:16 (Swed.)[14] ("If a written contract stipulates that an existing dispute, or one that may arise in the future stemming from a specified legal relationship, may be instituted in a certain court, or that a certain court is exclusively competent, this shall apply unless otherwise prescribed."); *see also* Affidavit

---

[13] This court applied Oklahoma law to reach this decision. Under Oklahoma choice-of-law rules, "the *lex loci contractus* controls–i.e., 'the nature, validity, and interpretation of a contract are governed by the law where the contract was made." *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1178 (10th Cir. 2009) (*Yavuz II*) (quoting *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1034 (Okla. 2006)). Here, the contract was negotiated through telephone and email conversations, and it is not immediately clear where the Contract was "made." The contract indicates that it comes into force after the Contract and the Bills of Exchange have been signed by both parties and the initial down payment has been received. [Doc. No. 49, Ex. 5 at 10]. The best evidence of where the contract was "made" may be found on the signature page, where it appears that representatives of both parties signed the document in Oklahoma. *Id.* This would suggest that Oklahoma law applies. M2 claims, however, that Laursen, who signed as the "seller," was without authority to bind M2 to the Contract. This court concludes that it is unnecessary to address M2's claim because, even if the court were to apply Swedish law, the outcome would not differ. *See* Convention on the Law Applicable to Contractual Obligations, art. 3, June 19, 1980, 19 ILM 1492, 1980 O.J. (L 266), ratified by Sweden Nov. 29, 1996, *see also* Doc. No. 37 Ex. C., Affidavit Regarding Opinions on Swedish Law, ¶1.2 ("Since the Contract designates Swedish law . . . as the applicable law, Chapter 10 Section 16 of the *Swedish 1942 Code of Judicial Procedure* is applicable to the Venue Provision.").

[14]*available at* http://www.sweden.gov.se/content/1/c6/02/77/78/30607300.pdf

13

Regarding Opinions on Swedish Law [Doc. No. 37, Ex. C at 2-3] (concluding that no exceptions to Code of Judicial Procedure 10:16 apply in this case, collecting and summarizing judicial rulings, and opining that Swedish courts tend to apply that provision strictly). Because it appears that Swedish law would enforce the venue-selection provision, this court concludes that the venue-selection provision is valid and enforceable.

The court further finds that the forum selection clause, which states the "[a]ny disputes...shall exclusively...be brought before and settled by the ordinary courts of Sweden," is mandatory rather than permissive. Finally, although Fleming has asserted claims of fraud, civil conspiracy, negligent misrepresentation, fraudulent concealment and constructive fraud, all of the claims emanate from the alleged breach by M2 of the contract between the parties. The forum selection provision provides that "[a]*ny* disputes arising in connection with the purchase of the SQM system" (emphasis added) will be brought in Sweden.

Accordingly, this case must be dismissed for lack of venue.

### III. Conclusion

For the reasons set forth above, defendant M2 Engineering AB's Motion to Dismiss [Doc. No. 37] is hereby granted.

ENTERED this 26th day of October, 2010.

*[signature]*
Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma